IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| HARVEY L. RICKS, III, | ) | No. 4:11-cv-00447-JAJ-RAW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BRANDON RICHMOND, | ) | REPORT AND RECOMMENDATION |
| STEVEN COURTNEY, CHARLES | ) | AND ORDERS |
| EDWARDS, BRAD GRIBBEN, SUSAN | ) | |
| MICHALSKI, SCOTT SHELLY, | ) | |
| STEVE SHIBER, EMILY SINNWELL, | ) | |
| ERIC WILSON, MICHAEL YOUNG, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Harvey L. Ricks, III, filed suit against
various detention officers employed by the Polk County Sheriff at
the Polk County Jail, as well as a jail nurse (Emily Sinnwell)
employed by a contract vendor of medical services. At issue is a
jail incident which occurred on September 19, 2010. At the time
plaintiff was a protective custody pretrial detainee at the jail.
Following ruling on defendants' motion for summary judgment [62],[1]
the only issues that remained for trial were (1) whether
plaintiff's placement in a restraint chair was punitive and (2)
whether officers failed to intervene to prevent the use of the
restraint chair and related conduct. Plaintiff alleges these
actions resulted in a violation of his rights under the Due Process

---

[1] The summary judgment dismissal of plaintiff's denial of
medical treatment claim necessarily dismisses Nurse Sinnwell from
the case. It is not clear from the record that Sinnwell was ever
served with the Complaint or responded to it. She was not named as
a defendant until plaintiff's Third Amended Complaint.

Clause of the Fourteenth Amendment to the United States Constitution. If a constitutional deprivation is demonstrated, the Court must address defendants' defense of qualified immunity.

This matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). An evidentiary hearing was held on November 13, 2013. Plaintiff appeared and was represented by appointed counsel Jeff Ewoldt and Margaret Hanson from the law firm of Davis, Brown, Koehn, Shors & Roberts, P.C.[2] Defendants appeared and were represented by Assistant Polk County Attorney Roger Kuhle.

Plaintiff testified personally and also presented Polk County Sheriff's Office Hearing Officer Tricia Amadeo as a witness. Defendants presented ten witnesses: Chief Jail Administrator Doug Phillips, Sheriff's Lieutenant Steve Little, Officer Eric Wilson, Officer Marla Smith, Nurse Emily Sinnwell, Officer Brandon Richmond, Officer Michael Young, Sergeant Steven Courtney, Officer Brad Gribben, and Officer Steve Shiber. In addition defendants

---

[2] Mr. Ewoldt and Ms. Hanson at the Court's request agreed to represent plaintiff after plaintiff's first *pro bono* counsel was granted leave to withdraw following the summary judgment ruling. The Court appreciates counsel's willingness to assist plaintiff. Not only plaintiff, but the Court, has benefitted from the vigor and quality of their representation.

offered the deposition testimony of Officer Susan Farrell (formerly Michalski).[3] The matter is fully submitted following post-trial briefs and argument.

# I.

## FINDINGS OF FACT

Plaintiff, a pretrial detainee, upon his arrival at the Polk County Jail on August 24, 2010 requested placement in protective custody, a form of administrative segregation. (Tr. at 8; Ex. M). He told jail staff that he did not want to be around other inmates. (Ex. M).

Administratively segregated inmates are housed in the jail's "Special Housing Unit" ("SHU"). SHU inmates spend the majority of their day in their cells. A SHU inmate is allowed out of his cell for one hour each shift during which time the inmate may shower, obtain reading material, and take advantage of what recreational opportunities are available on the unit. (Tr. at 7, 139).

Defendant Courtney, a detention officer sergeant who was the SHU supervisor at the time of the incident in question, and defendants Richmond and Young, detention officers also on duty at the time, testified about jail policies concerning the use of restraints on SHU inmates when out of their cells during recreation

---

[3] Officer Farrell married after the incident with plaintiff. At the time of the incident her name was Susan Michalski. (Ex. Q (Farrell Depo.) at 5). She is a defendant.

time. They testified that if an inmate is going directly to the shower he would be handcuffed in front with no leg restraints (also referred to as leg shackles in the record). If after showering the inmate intended to stay out of his cell and move about the unit as he was entitled to do during his one-hour period, the inmate was required to be in leg restraints in addition to handcuffs. (Tr. at 141, 153-54, 171, 181). Handcuffs and leg restraints were required because, as an administrative segregation unit, the SHU tended to house the more potentially disruptive inmates. (*Id.* at 18). These witnesses were not, however, able to identify a written policy or post order to this effect and Richmond's affidavits are not consistent on the subject. (*Id.* at 153).

Plaintiff testified that before this incident he had not been placed in leg restraints when taken out of the shower. (Tr. at 11). Plaintiff's routine had been to take a shower after which he would go pick up a couple of books and then return to his cell. (*Id.* at 8-9). Though plaintiff and Richmond had seen each other before, until September 19, 2010 they had not been in contact. (*Id.* at 145).

In the absence of evidence of a written policy it is probable that leg restraints for SHU inmates intending to remain out of their cells during recreation time, if a practice, was a matter in which detention officers had a degree of discretion. Discretion on the subject was consistent with the Sheriff's general order on the use of restraints then in effect. (*See* Ex. E).

4

On September 19, 2010, sometime before 10:30 a.m., plaintiff was released from his cell and escorted by Officer Richmond to the SHU shower where Richmond uncuffed him. Plaintiff was not in leg restraints. Plaintiff, as usual, intended to shower, get some books and return to his cell. (Tr. at 8, 10). What occurred after plaintiff exited the shower was captured on a jail video camera, though part of what occurred is obscured by a table and there is no audio. (Ex. A).

After plaintiff showered, Officer Richmond entered the shower area, which was off camera. Richmond reapplied the handcuffs with plaintiff's hands in front. The video shows plaintiff and Officer Richmond emerging from the shower area and walking toward the center of the unit. Both agree Richmond asked plaintiff why he was in protective custody, and that this question angered plaintiff. Plaintiff testified Richmond put his question in a loud voice. (Tr. at 10). The video shows the two were together with no one near them.[4] Plaintiff valued anonymity as a means to avoid problems with other inmates. (*Id.*) Officer Richmond testified he was merely trying to strike up a conversation with plaintiff and did not raise his voice in asking the question. (*Id.* at 142). He said he often asked protective custody inmates about their status to learn more about them and, occasionally, he would encourage an

---

[4] Only two SHU inmates at a time were allowed out of their cells for the one hour period, and while out were not allowed to interact with each other. (Tr. at 152).

inmate to go back to the general population with its greater freedom. (*Id.* at 149-50).

Plaintiff told Officer Richmond it was none of Richmond's business why he was in protective custody. (Tr. at 10). According to plaintiff Richmond responded saying if plaintiff wanted to be a "smart ass" his recreation time was up, told plaintiff to go to his cell and then said plaintiff would have to "shackle up." (*Id.* at 11). Plaintiff asked Richmond why he had to shackle up. Richmond responded with a direct order to do so, telling plaintiff to put his feet on the bench of a nearby table to permit Richmond to apply the leg restraints. (*Id.* at 11-12). Plaintiff continued to protest. Plaintiff testified Richmond grabbed plaintiff's shirt, plaintiff tried to pull away, and Richmond responded by putting him in a choke hold. As plaintiff describes it, he then fell to the floor with Richmond, with his head and elbow striking the floor. (*Id.* at 11-13).

Officer Richmond testified plaintiff told him he wanted to stay out of his cell to get some books. (Tr. at 142). Richmond then told plaintiff he would have to put leg shackles on him. Plaintiff responded "bullsh*t" and said he was not putting leg shackles on. (*Id.*) Richmond testified he told plaintiff if he did not put the leg shackles on, his recreation time was up and he would have to go back to his cell. Plaintiff did not want to go back to his cell and Richmond informed him if he was going to stay

6

out, he would have to get up on the nearby bench for leg restraints
to be put on. Richmond testified he told plaintiff this three
times, the last time attempting to guide plaintiff to the bench by
lightly touching plaintiff's back or jumpsuit. (*Id.* at 142-44).
According to Richmond, at this point plaintiff "swung" at him,
contacting him with plaintiff's left elbow. Richmond responded by
bear hugging plaintiff's upper body and they fell to the ground
together. (*Id.* at 142-44).

The Court does not accept the testimony of either
plaintiff or Officer Richmond entirely, though Richmond's testimony
is more consistent with the sequence of events as shown on the
video. The testimony of both is affected by their interest in the
case.

In the video Officer Richmond, addressing plaintiff,
points to the bench three times which is consistent with Richmond's
testimony about the directions he gave. When Richmond points to the
bench a fourth time the video shows he put his arm behind plaintiff
in what appears to be an effort to guide him to the bench the two
were standing near. Plaintiff quickly turns and with his handcuffed
hands pushes Richmond in the right chest or shoulder area. He did
not "swing" at Richmond. Richmond promptly responds by grabbing
plaintiff around his neck and shoulder area and the two fall to the
floor together. The view of what happened on the floor is obscured
by the table and bench. It all occurs very quickly. According to

the video clock, fifteen seconds elapses from the time Richmond and plaintiff leave the shower area and the takedown occurs.

Other officers quickly came to Officer Richmond's aid, including three members of the "Utility Response Team" ("URT") identified by their red shirts, and Sergeant Courtney wearing a black shirt. (Ex. Q (Farrell Depo.) at 4-15). Young, the other detention officer working in the SHU that day, was the first to arrive, within seconds. Young placed a taser on plaintiff's right calf and told him that if he continued to struggle he (Young) would discharge the taser. (Tr. at 174-75; Ex. C). At that point plaintiff ceased struggling. Young did not discharge the taser. Leg restraints were applied, plaintiff was assisted to his feet, and guided to his cell only a few feet away followed by numerous officers, six or seven of whom at one point or another entered his cell. The video clock shows that about two minutes passed between the time plaintiff and Richmond fell to the floor and plaintiff was brought to his feet.

In its summary judgment ruling the Court found on the basis of the clear video evidence that there was no genuine issue of material fact on plaintiff's excessive force claim based on the force used after plaintiff made the abrupt movement toward Officer Richmond, and that the force was reasonable under the circumstances. (Summary Judgment Ruling [62] at 6-7). What occurred after plaintiff was brought to his feet and escorted to his cell is

8

the basis for plaintiff's claim that his subsequent confinement in the restraint chair was punishment meted out in violation of his Due Process rights. The Court held that claim presented a trial-worthy issue. (*Id.* at 9).

The video does not show what happened in plaintiff's cell. It does show numerous officers entering the cell and Sergeant Courtney observing what was occurring within.

URT Officer Gribben and Officer Richmond had a hold of plaintiff while in the cell, more so Gribben. Initially the officers' intent was to follow the usual procedure by which a disruptive inmate was placed in a cell: put the inmate on his knees on the bunk, uncuff the inmate's hands and have the inmate put them on the cell wall, remove the leg restraints, and back out of the cell. (Tr. at 146, 185-87, 206). Though there is some disagreement about it, the Court finds plaintiff put his knees on the bunk as directed. (*Id.* at 195, 206, 211). The process, however, did not progress beyond that point. The testimony of the officers present was uniform that plaintiff was yelling; threats and swearing most said. (*Id.* at 118, 147, 183, 206, 223; Ex. C at 1-2; Ex. Q (Farrell Depo.) at 14). Officer Gribben, whose testimony the Court finds credible, could feel tension in plaintiff's arm and his upper body tensing up (Tr. at 206-07.[5] Gribben, and others, repeatedly told

---

[5] Officer Gribben described the tension variously as "restrictive" or "resistive" tension. (Tr. at 206-07).

plaintiff to relax and calm down. (*Id.* at 60, 207). Plaintiff did not relax and remained tense. Gribben was reluctant to take the handcuffs off while plaintiff remained physically tense. (*Id.* at 206-07). He placed plaintiff on his stomach on the bunk.

In his testimony plaintiff claimed that he was calm in the cell, did not resist and put his knees on the bunk as instructed. (Tr. at 18-19). He did put his knees on the bunk and did not overtly resist, but he was not calm. The preponderance of the evidence establishes plaintiff was agitated and loudly protesting as described generally by the officers present. On their part the officers were no doubt loud and forceful in their instructions to plaintiff. (*See id.* at 118). Plaintiff admits he was told to relax repeatedly. (*Id.* at 20, 60). He also admits to being tense which made it difficult for him to relax. (*Id.* at 20-21).[6]

The video shows that Sergeant Courtney watched most of this from the vicinity of the cell door. He testified in substance that because, as he had been told, plaintiff had already assaulted an officer, remained tense, was making threats and had not calmed down, he decided to put him in the restraint chair as a safety

---

[6] Plaintiff denied swearing at and threatening the officers, but in one of his hand-written complaints he wrote that he was scared and said loudly so the whole unit could hear him that he could not lie flat. In his testimony said he wanted the other inmates to hear what was going on. (Tr. at 52-53; Second Amended Complaint [35] ¶ 17).

precaution to let him cool down. (Tr. at 183-86). Courtney was the sole restraint chair decision maker. He denied any intent to punish plaintiff. (*Id.* at 188-89).

Plaintiff was re-handcuffed (behind his back this time), brought to his feet, taken out of his cell and escorted by URT Officer Susan Farrell to the SHU sallyport where plaintiff was placed in the restraint chair. On the video plaintiff can be seen walking through the unit accompanied by Farrell and not resisting. The video time clock shows plaintiff being taken out of his cell about at 10:37 a.m., a little over two minutes after being placed in the cell.[7]

At the sallyport plaintiff was placed in the restraint chair without incident. His legs, waist, arms and shoulders were strapped in. He was wheeled to the medical unit holding area. What occurred in the medical unit was also recorded by video camera. (Ex. A). Plaintiff arrived in the medical unit at about 10:40 a.m. by the video clock. Nurse Sinnwell examined the restraints to make sure they were not too tight. (Tr. at 136). Plaintiff's elbow had been injured when he fell to the SHU floor and was bleeding. The wound was photographed. It appears to have been a minor scrape or abrasion. (Ex. B at 5). Sinnwell cleaned the wound with saline and

---

[7] The Court does not understand plaintiff to complain he was subjected to excessive force in his cell prior to being taken to the restraint chair. The force used was essentially holding him in place. It was not excessive in relation to purpose and no injury resulted.

applied a band-aid. Plaintiff did not complain of a head injury as he now does. (Tr. at 132-33). The video shows other inmates were moved in and out of holding cells in the medical unit. Plaintiff was eventually placed in a medical unit holding cell at about 10:56 a.m.

The supervision log indicates plaintiff was checked at 11:37 a.m. and again at 11:52 a.m.[8] (Ex. I). At noon Sheriff's Lieutenant Steve Little observed that plaintiff was calm and signed off on his release from the restraint chair. Plaintiff was taken out of the medical holding cell at 12:03 p.m. and wheeled back to the SHU where he was released from the chair. Plaintiff had been in the restraint chair for a total of about an hour and a half, and in the medical holding cell for a little over an hour.

On September 19, 2010, shortly after the incident, a rules violation report was written up and provided to plaintiff. (Ex. J at 1). A Polk County Sheriff's Office hearing officer, Trisha Amadeo, conducted a hearing on September 21, 2010 which apparently consisted of reviewing the reports of the officers

---

[8] The log is not accurate, at least as to time. A video camera was in the medical holding cell recording plaintiff for the duration of his stay. At about 11:22 a.m. as shown on the video clock a detention officer entered the cell, checked plaintiff's restraints, exited and then returned a minute or two later to wipe plaintiff's nose (an action recorded in the 11:37 a.m. log entry). The same officer entered again briefly at about 11:49 a.m. but did not approach plaintiff. Plaintiff may at other times have been observed from outside the cell, the door of which had two large glass panels facing the medical holding area.

involved and interviewing plaintiff. (Tr. at 78). The violation report and Amadeo's hearing findings state inconsistently that plaintiff "did not" and "did" admit to the alleged rule violations. (Ex. J at 1, 4). Plaintiff may have admitted to some of the background facts, but the Court doubts very much that he would have admitted the version of the incident described in the several officers' reports. In any event, plaintiff was found to have committed a number of jail rules violations in connection with the incident and was sanctioned with twenty-five days disciplinary segregation (ten days suspended) with accompanying telephone, television and commissary restrictions. (*Id.* at 1, 5). About two months later plaintiff submitted a jail grievance alleging excessive force and complaining about the use of the restraint chair in connection with the September 19 incident. The grievance was denied. (Ex. K).

The general orders adopted and in effect at the Polk County Jail at the time of the incident prohibited the use of physical force for punitive purposes. (Ex. F). Use of a restraint chair was subject to strict rules. It had to be approved by a supervisor. (Ex. H at 1). The chair was to be used to prevent self-injury, injury to others, property damage and "to control inmates displaying extremely aggressive and violent behavior . . . [w]hen other control techniques are not applicable in controlling the inmate." (*Id.*) Jail "health authority" was to be notified to assess the inmate's medical and mental health condition. (*Id.*) The inmate

13

was to be observed by jail staff every fifteen minutes while in a restraint chair and a log entry made documenting the observation. (*Id.*) The inmate was to be considered for removal from the chair at least hourly, and could not be confined to the chair longer than four hours unless authorized by the shift commander with review of the inmate's condition by medical staff. (*Id.* at 1-2).

## II.

### ANALYSIS AND ULTIMATE FINDINGS

A.   <u>Punitive Use of the Restraint Chair</u>

    1.   Standard

Under the Due Process Clause a pretrial detainee may not be punished in advance of an adjudication of guilt. *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979). A pretrial detainee is presumed innocent until proven guilty. *Id.* at 553. It is well-established, however, that there is a legitimate governmental interest in maintaining the security of a jail, including the safety of the detainee, others similarly situated, and jail staff. *Id.* at 540. *De minimis* restraint of a person's freedom pending trial does not constitute a constitutional violation. *Id.* at 537. The Court must examine the totality of the circumstances when evaluating whether a pretrial detainee's due process rights have been violated by a restriction or restraint. *See Stickley v. Byrd*, 703 F.3d 421, 423 (8th Cir. 2013)(citing *Morris v. Zefferi*, 601 F.3d 805, 810 (8th Cir. 2010)).

14

Determination of whether a particular restraint or restriction imposed on a pretrial detainee amounts to unconstitutional punishment involves a three-step analysis distilled from the Supreme Court's seminal opinion in *Bell*.

> (1) whether the action was imposed for the purpose of punishment or whether it was but an incident of some other legitimate governmental purpose . . .; (2) assuming that the action was not intended as punishment and giving deference to the decisions of jail officials, whether the action was rationally related to a legitimate governmental purpose . . .; and (3) assuming that the action was not intended as punishment and assuming that it was rationally related to a legitimate governmental purpose, whether the action was excessive when compared with the governmental purpose for which the action was undertaken.

*Birdine v. Gray*, 375 F. Supp. 2d 874, 879 (D. Neb. 2005)(citing *Bell*, 441 U.S. at 538); *see Morris*, 601 F.3d at 810 (quoting *Bell*, 441 U.S. at 538-39); *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007), *cert. denied*, 552 U.S. 1180 (2008)(quoting *Rapier v. Harris*, 172 F.3d 999, 1005 (7th Cir. 1999)).

As the Court has already recognized in this case, placing a pretrial detainee in a restraint chair may amount to unconstitutional punishment. (Summary Judgment Ruling [62] at 7). Absent an intent to punish, courts in this circuit have looked to a number of factors in determining whether punishment of a pretrial detainee should be inferred from confinement in a restraint chair. As relevant here these include: (1) the events preceding the detainee's placement in the chair; (2) whether jail staff

15

considered alternatives to further their purpose; (3) the duration of time the detainee was restrained; (4) whether the detainee was adequately monitored while in the chair; and (5) whether the detainee was injured or suffered pain from confinement in the chair. *See Undlin v. City of Minneapolis,* 2009 WL 3754208, at *5-6 (D. Minn. November 4, 2009)(citing cases); *Davis v. Lancaster County*, 2007 WL 2728549, at *4-8 (D. Neb. Sept. 17, 2007); *Pardue v. Glass*, 2007 U.S. Dist. LEXIS 45277, at *15-18 (W.D. Ark. April 11, 2007)(magistrate judge report and recommendation adopted 2008 U.S. Dist. LEXIS 6666 (W.D. Ark. Jan. 29, 2008)); *Birdine*, 375 F. Supp. 2d at 880-81.

   2.   Application

      The evidence does not establish that Sergeant Courtney had a punitive purpose in ordering plaintiff's placement in the restraint chair. If the Court were to attribute a punitive intent to Courtney, the Court would have to believe he acted in direct contravention of the jail policies governing the use of the restraint chair. There is no convincing evidence of this.[9] Sergeant Courtney credibly testified he ordered the restraint chair for the safety of all involved and to allow an agitated inmate who had just been involved in an altercation with an officer to cool down. Had

_____

      [9] Plaintiff testified that during his post-altercation restraint in his cell he heard an officer, who he thought was a URT officer, say "let's put this motherf***er in the chair." (Tr. at 20, 55). There is no evidence who made the comment. URT officer Gribben denied hearing it. (*Id.* at 208).

Courtney been intent on punishing plaintiff there would have been no reason to first take plaintiff to his cell where, as Courtney testified, "the goal always is to just exit the cell without any type of incident." (Tr. at 186). All testified to the officers' efforts to get plaintiff to relax, though plaintiff attributed his inability to relax to the way he was being held by the officers. How plaintiff was being held and talked to may indeed may have made it difficult for him to relax, but the fact is plaintiff remained wound up. After observing what was occurring in the cell Courtney decided release and exiting the cell was not a "good option." (*Id.* at 187). He acted with a measure of deliberation.

Plaintiff argues putting him in the restraint chair was at odds with jail policy concerning use of the chair in that it was not necessary to prevent injury, property damage or to control "extremely aggressive and violent behavior." (Ex. H at 1). The point is arguable, particularly whether plaintiff's behavior was extremely aggressive or violent. If placement in the chair was clearly violative of jail policy so that no reasonable officer in Sergeant Courtney's position could believe use of the chair was authorized, that fact would permit an inference of punitive intent on Courtney's part. Application of the policy in the circumstances presented was not so clear as to permit this inference.[10]

---

[10]   Chief Jail Administrator Doug Phillips opined that plaintiff's placement in the restraint chair was appropriate under the jail policies in effect at the time. (Tr. at 93-94).

Putting an agitated pretrial detainee in a restraint chair for a reasonable period of time in order to calm the detainee down after a physical altercation with a detention officer is reasonably related to the legitimate governmental purpose of maintaining the safety and security of the jail. *Bell*, 441 U.S. at 540. Whether in plaintiff's case use of the restraint chair was in fact reasonably related to that purpose, or was excessive, requires consideration of relevant factors like those discussed in *Undlin, Davis*, *Glass*, and *Birdine*, *supra*. These all weigh in favor of a finding plaintiff's confinement in the chair was not punitive.

The events preceding plaintiff's placement in the chair have been extensively discussed to this point. He pushed Officer Richmond, the two ended up struggling on the floor, he was agitated and loud when taken to his cell, his tense muscles and unwillingness (or inability) to relax gave officers concern he might be assaultive if they released their hold. Sergeant Courtney, the supervisor who made the decision, considered the alternative of releasing the physical hold on plaintiff and having the officers back out of the cell, but decided against it. He did not consider leaving plaintiff locked in his cell with handcuffs and leg restraints in place as plaintiff suggests might have been done, but this too would have been a significant restraint. The Court is also not convinced of the reasonableness of this alternative.

18

The video shows that plaintiff appeared physically calm when he was led from his cell to the sallyport for placement in the restraint chair (as was the officer escorting him, Farrell, and the others trailing behind) and he did not resist when he was placed in the chair. Sergeant Courtney could have concluded from this that the need for placement in the chair had abated, but was not bound to do so. In the totality of the circumstances the Court is not convinced that this brief interlude of apparent passivity severed the relationship between use of the chair and the legitimate purpose of maintaining jail safety and security.

Plaintiff was not put in the chair for an extended period and was released after about an hour in the medical holding cell. The log entries for plaintiff's confinement indicate plaintiff was not monitored as frequently as he should have been while in the chair, but the monitoring he received was not inadequate. The straps were checked for proper fit when he was placed in the chair. They were checked again by Nurse Sinnwell in the medical holding area to assure they were not too tight. Sinnwell observed plaintiff's physical condition and treated his elbow injury. Pictures were taken of plaintiff's condition at the time. While plaintiff sat in the middle of the medical holding area waiting to be placed in the holding cell he was under the constant observation of the detention officers and nearby medical staff. During his time in the holding cell an officer entered twice, once checking the

restraints and wiping plaintiff's nose. The predominantly glass cell door permitted observation of plaintiff from the medical holding area. After about an hour, as required by the restraint chair policy, Lieutenant Little, finding no need for continued use of the chair, authorized plaintiff's release. Plaintiff did not suffer injury or significant pain from confinement in the chair, indeed adequate steps were taken to ensure these things would not occur.

All of this, together with the degree of deference to which jail officials are entitled, *Bell*, 441 U.S. at 540-41 n.23, leads to the ultimate findings that plaintiff's placement in the restraint chair was not imposed for the purpose of punishment, was reasonably related to a legitimate governmental purpose, and was not excessive. It follows plaintiff's brief confinement in the restraint chair was not punishment in violation of his rights under the Due Process Clause of the Fourteenth Amendment.

Subject to defendants' relevancy, hearsay and improper opinion objections, the Court received Exhibit P offered by plaintiff. The exhibit is a "closing communication" from the Assistant for Corrections of the Iowa Office of Ombudsman ("Citizens' Aide"). *See* Iowa Code ch. 2C. Plaintiff wrote to the Ombudsman in December 2010 complaining about the September 19, 2010 incident. The Ombudsman's Office reviewed plaintiff's complaint together with other inmate use of force complaints from the jail.

Shortly before trial, on October 4, 2013 the Assistant Ombudsman
wrote to plaintiff that after receiving records of the incident and
reviewing the video the Ombudsman and Assistant met with Chief Jail
Administrator Phillips in the course of which they "shared . . .
concerns" with Phillips about plaintiff's complaint. These were:
(1) the officer (Richmond) created an unsafe situation by demanding
plaintiff put on leg restraints in an open area, and by getting
into plaintiff's "personal space and . . . touching him" when
plaintiff did not appear to be causing a problem; and (2) the use
of the restraint chair was not justified because Officer Young's
incident report made no mention of a threat by plaintiff to harm
himself or others or to destroy property, and the video showed
plaintiff walked calmly out of his cell to the restraint chair and
cooperated in being placed in the chair.

Putting aside the hearsay objection, the letter is not
admissible because it presents a lay opinion which is not helpful
either to understand a witness's testimony, or to determine any
fact in issue bearing upon the constitutionality of plaintiff's
placement in the restraint chair. Fed. R. Evid. 701(b). The letter
does, however, serve to illustrate the point that the fundamental
issue in this case is not whether Officer Richmond acted properly
or whether Sergeant Courtney's decision to place plaintiff in the
restraint chair was rightly or wrongly made, but whether in the
totality of circumstances placement in the chair was

unconstitutionally punitive. Reasonable minds can certainly disagree about Richmond's conduct and Courtney's decision, but the Ombudsman's opinion on those subjects is not helpful in determining the issue before the Court.[11]

B.   Intervention

Plaintiff alleges that the other defendant officers involved should have intervened to prevent plaintiff from being put in the restraint chair as directed by Sergeant Courtney. As the Court has found plaintiff's placement in the restraint chair did not violate plaintiff's Due Process rights, the intervention claim must likewise fail. (*See* Summary Judgment Ruling [62] at 12).

In any event, the evidence would not support the failure to intervene claim. A jail detention officer, like a prison guard, may be liable for failure to intervene to protect an inmate if the officer is deliberately indifferent to the inmate's "health and

---

[11] In February 2014 jail administrator Phillips spoke with the Ombudsman again about the letter sent to plaintiff. The Ombudsman subsequently wrote to Phillips stressing that the concerns and conclusions in the letter to plaintiff were not "specific findings and conclusions critical" of the use of force on plaintiff because the Ombudsman's Office did not complete an in-depth investigation. Defendants have filed a motion [96] to reopen the record to permit them to offer the Ombudsman's qualifying letter as Exhibit R. Plaintiff has resisted. As the Court views the opinions in the letter to plaintiff (Ex. P) as inadmissible and, in any case of minimal probative value, there is no need to add to the record. The motion will be denied.

safety."[12] *Buckner v. Hollins*, 983 F.2d 119, 122 (8th Cir. 1993); *see Burgess v. Moore*, 39 F.3d 216, 218 (8th Cir. 1994); *Hicks v. Norwood*, 666 F. Supp. 2d 957, 967 (W.D. Ark. 2009). Here the officers who put plaintiff in the restraint chair had no reason to believe that doing so involved any significant risk to plaintiff's health and safety. In fact, the jail policies which limit use of the chair and prescribe procedures for when it is used are designed to minimize risk to the health or safety of the inmate.

## III.

### RECOMMENDATION AND ORDERS

In view of the foregoing IT IS RESPECTFULLY RECOMMENDED that the Court conclude plaintiff failed to prove that his placement in the restraint chair at the Polk County Jail on September 19, 2010 was punishment in violation of his rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, or that any defendant failed to intervene to prevent such a violation, and that judgment be entered dismissing plaintiff's Complaint;

IT IS ORDERED that defendants' motion to reopen the record [96] is **denied**;

---

[12] The custodian's duties to protect convicted persons and pretrial detainees are comparable, though the source of those duties differs, the Eighth Amendment for convicted prisoners and the Due Process Clause of the Fourteenth Amendment for pretrial detainees in state custody. *Schoelch v. Mitchell*, 625 F.3d 1041, 1046 (8th Cir. 2010).

IT IS FURTHER ORDERED that the parties have until **May 5, 2014** to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1). *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Wade for Robinson v. Callahan*, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. *See* Fed. R. Civ. P. 72; *Thompson*, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of a party's right to appeal questions of fact. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994); *Halpin v. Shalala*, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); *Thompson*, 897 F.2d at 357.

IT IS SO ORDERED.

Dated this 14th day of April, 2014.

ROSS A. WALTERS
UNITED STATES MAGISTRATE JUDGE